E-FILED; Baltimore County Circuit Court
Docket: 3/14/2026 10:30 PM; Submission: 3/14/2026 10:30 PM
Envelope: 25549011

IN THE CIRCUIT COURT FOR BALTIMORE COUNTY, MARYLAND

| | |
|---|---|
| DAVETTE CEASAR<br>7501 Trafalgar Circle<br>Apt. 156<br>Hanover, Maryland 21076<br><br>            Plaintiff<br><br>    v.<br><br>BOARD OF TRUSTEES OF THE<br>COMMUNITY COLLEGE OF<br>BALTIMORE COUNTY<br>7021 Rossville Boulevard<br>Baltimore, Maryland 21237<br><br>    Serve:  Richard A. Scheper, Ph.D.<br>              Chair of the Board of Trustees<br>              Community Coll. of Balt. County<br>              7201 Rossville Boulevard<br>              Baltimore, Maryland 21237<br><br>    and<br><br>COMMUNITY COLLEGE OF<br>BALTIMORE COUNTY<br>7021 Rossville Boulevard<br>Baltimore, Maryland 21237<br><br>    Serve:  Sandra L. Kurtinitis, Ph.D.<br>              President of CCBC<br>              Office of the President<br>              Community Coll. of Balt. County<br>              7201 Rossville Boulevard<br>              ADMN 105G<br>              Baltimore, Maryland 21237<br><br>    Defendants | *<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>* |

Case No.: C-03-CV-26-001165
_____

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## COMPLAINT
## AND JURY DEMAND

Plaintiff Davette Ceasar, by and through her undersigned counsel, hereby brings this

action for monetary damages and other relief against her former employer, Defendants Board of

**Exhibit A**

Trustees of the Community College of Baltimore County and Community College of Baltimore County, and states as follows:

**PARTIES AND JURISDICTION**

1.    Plaintiff Davette Ceasar is an adult resident of the State of Maryland, currently residing in Anne Arundel County at 7501 Trafalgar Circle, Apt. 156, Hanover, Maryland 21076. She shall be referred to hereinafter as "Plaintiff" or "Ms. Ceasar."

2.    Plaintiff is a former employee of Defendants Board of Trustees of the Community College of Baltimore County and Community College of Baltimore County, who, starting on November 11, 2024, worked for them as a Business Data Analyst at their Catonsville campus located at 800 South Rolling Road, Catonsville, Baltimore County, Maryland 21228, until her involuntary termination on March 19, 2025.

3.    Defendant Board of Trustees of the Community College of Baltimore County is empowered by Maryland statute to, among other things, "exercise general control over the [C]ommunity [C]ollege" of Baltimore County, *see* Md. Code Ann., Educ. § 16-103(c), and its principal place of business is located in Baltimore County at 7021 Rossville Boulevard, Baltimore, Maryland 21237.   Maryland law dictates that the board of trustees for each community college "may carry comprehensive liability insurance to protect the board, its agents and employees, and the agents and employees of any community college under its jurisdiction." *Id*. at § 16-107(a).   Moreover, the Board of Trustees of the Community College of Baltimore County may "be sued," and may also "apply for and accept any gift or grant from the federal government" as well as "make agreements with the federal government." *Id*. at § 16-103(h), (k), (l).   This Defendant shall hereinafter be referred to, individually, as the "Board of Trustees."

4.    Defendant Community College of Baltimore County is a public community college with its principal place of business located in Baltimore County at 7021 Rossville

Boulevard, Baltimore, Maryland 21237.  It has three main campuses situated in Catonsville, Dundalk, and Essex, and it is attended, to varying degrees, by approximately 50,000 students. This Defendant shall hereinafter be referred to, individually, as the "Community College."

5.      Defendants Board of Trustees of the Community College of Baltimore County and Community College of Baltimore County shall be referred to hereinafter, collectively, as "Defendants," "CCBC," or the "College."

6.      This action is based upon the acts and omissions of Defendants and their actual or apparent agents, servants, and employees, and arose from conduct occurring in Baltimore County, Maryland.

7.      Defendants have employed in excess of 1,000 persons at all times relevant.

8.      At all times pertinent, including throughout Plaintiff's employment and thereafter, Defendants have been the recipients of federal financial assistance such that compliance with the federal Rehabilitation Act is required.[1]  For example and not limitation, Defendants receive federal funds in relation to their Upward Bound and Federal Work-Study programs as well as their participation in various federal student loan and grant programs.

9.      This Honorable Court may exercise personal jurisdiction over Defendants pursuant to Md. Code Ann., Courts & Jud. Proc. § 6-102 and/or § 6-103.  Venue is appropriate under Md. Code Ann., Courts & Jud. Proc. § 6-201.  *See also* Md. Code Ann., State Gov't §§ 20-1013(b).

---

[1]  *See* 29 U.S.C. § 794 ("No otherwise qualified individual with a disability in the United States … shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance ….  For the purposes of this section, the term 'program or activity' means all of the operations of … a department, agency, … or other instrumentality of a State or of a local government; or … the entity of such State or local government that distributes such assistance and each such department or agency (and each other State or local government entity) to which the assistance is extended, in the case of assistance to a State or local government; [and] a college, university, or other postsecondary institution, or a public system of higher education; … any part of which is extended Federal financial assistance.").

10.     To the extent necessary, Plaintiff has exhausted her administrative remedies and otherwise fulfilled all conditions precedent to bringing the claims asserted below.  *See infra* ¶¶ 38 n.7, 42 n.9, 47-59.

### STATEMENT OF FACTS CENTRAL TO
### PLAINTIFF'S CAUSES OF ACTION

11.     Plaintiff first began working for Defendants on November 11, 2024. She was employed as a Business Data Analyst in the Administrative Services Division of the College on its Catonsville campus under a fully-executed written contract entitled "The Community College of Baltimore County, Employment Agreement, Professional Employee."

12.     At all times pertinent, Plaintiff performed her assigned primary job duties at a level that would meet or exceed the legitimate expectations of a reasonable employer.

13.     Under the terms of the aforementioned contract, which was signed by Plaintiff as well as the Vice President of CCBC and their President, Sandra L. Kurtinitis, Ph.D. (both acting within the scope of their authority on behalf of Defendants), either Plaintiff or Defendants could terminate the contract for "any reason" with the provision of at least six months' advanced notice (during which time Plaintiff would continue to be paid) or, in the alternative, at any time "for cause."

14.     Importantly, even where the termination was allegedly for cause, Plaintiff's "pay or benefits" still had to be provided to her by Defendants.  More specifically, under the contract's terms, whether it was terminated by either of the parties with or without cause, Plaintiff maintains that she should have remained entitled to payment for the six-month notice period.

15.     On or about December 2, 2024, for reasons that will be made clear below, *see infra* ¶ 29, Plaintiff felt compelled to provide her formal notice of resignation in keeping with the

terms of her contract.    She informed Defendants that her last day of work would be September 1, 2025.

16.    However, on March 19, 2025 -- well before September 1st -- Plaintiff was involuntarily terminated by Defendants under circumstances which Plaintiff maintains violate the Maryland Fair Employment Practices Act (hereinafter "MFEPA"), the Americans with Disabilities Act, as amended (hereinafter "ADA"), the Rehabilitation Act, as amended, and Maryland's common law of wrongful discharge (for the termination of an employee for filing a workers' compensation claim).

17.    Plaintiff further takes the position that, before her firing, CCBC failed and refused to reasonably accommodate her, failed and refused to engage in good faith in the interactive process or provide an individualized assessment of her in light of her disabilities,[2] unreasonably delayed the provision of reasonable accommodations, and mistreated and harassed her in violation of the above-referenced statutes.[3]

18.    Plaintiff additionally maintains that Defendants did not have cause to terminate her contractual employment, rendering them in breach of the parties' contract.    Defendants are also in breach of the contract in relation to their failure to pay Plaintiff monies owed as a result of, or following, her termination on March 19, 2025.

19.    Both before and during her period of employment at CCBC (and thereafter, for that matter), Plaintiff has suffered from certain health conditions which render her disabled

---

[2] This failure constitutes an unlawful employment practice on its own under Maryland law.  *See* COMAR § 14.03.02.04.B.(3).

[3] It will come as no surprise to this Court that Defendants are expected to argue, in defending this suit, that there were deficiencies in Plaintiff's work performance.  Plaintiff denies this but notes that any such deficiencies, even if they existed (and, to be clear, they did not), would have very little, if anything, to do with the illegal misconduct by Defendants referenced in this paragraph.  Simply stated, an employer is obligated under the law to timely and reasonably accommodate a disabled worker and not harass them regardless of whether the worker is the employer's best performer, worst performer, or anywhere in between.

within the scope and meaning of the federal and state anti-discrimination laws and which further render her in need of -- and entitled to -- reasonable accommodations. *See, e.g.,* Md. Code Ann., State Gov't § 20-601(b); COMAR § 14.03.02.05.A.(1).

20.    As Plaintiff expressly informed Defendants' ADAAA Administrator Heather R. Kaplan on October 10, 2024 -- well before her employment even began -- "I would like to seek accommodations for my hearing loss, sensitivity, and variable limited mobility."

21.    Later in October 2024, in relation to Plaintiff's hearing impairment, she submitted an ADAAA Medical Assessment Form that has been completed by her audiologist. Through this form and an accompanying letter, CCBC was informed that Plaintiff had an "indefinite/permanent" impairment to her hearing in the form of "bilateral sensorineural hearing loss," that she would be able to perform her duties "with accommodation," that such accommodations would be "required for the duration of her employment," and that certain accommodations were needed or would "become apparent in the future." At a minimum, Plaintiff's impairment obviously substantially limits the major life activity of hearing.

22.    With respect her aforementioned variable limited mobility impairment, Plaintiff suffers from complex regional pain syndrome in her left leg, as CCBC knew throughout her employment. As she did in relation to her audiological impairment, Plaintiff provided both documentation and medical records concerning this disability to CCBC even before she began working for the College. Among other things, Plaintiff's complex regional pain syndrome substantially limits the major life activities of walking and standing, and also adversely affects the operation of her neurological bodily system and perhaps others.

23.    In relation to her disabilities, Plaintiff further informed Defendants very early in her employment, on November 15, 2024, that "the process of commuting to the college [is] a source of great discomfort …."

24.     Subsequently, on November 26, 2024, Plaintiff advised them about her use of a "walking cane" and having to deal with "extreme nerve pain."

25.     Later, on or about January 2, 2025, Plaintiff provided Defendants with a note from her healthcare provider stating that she

> has a history of a lower extremity condition that makes walking difficult related to significant pain.   Prolonged walking and intermittent walking during the day contributes to pain and weakness of her lower extremity even when using an assistive device. I recommend that she have special consideration minimizing walking especially working from home and going into the office once a week.

It should be noted that, soon thereafter, Plaintiff would modify her request for this reasonable accommodation of four-days-per-week of teleworking to a request for full-time teleworking.

26.     Based upon the above-described disabling conditions, Plaintiff sought a number of reasonable accommodations from CCBC, some of which were provided to her, albeit in a delayed fashion.  But one reasonable accommodation that continuously remained almost wholly ungranted by Defendants was the accommodation of teleworking.   From their first correspondence on this issue on or about November 22, 2024 and throughout the remainder of Plaintiff's employment, Defendants would only allow Plaintiff to telework on a relatively small allotment of work days.

27.     Teleworking is well-recognized as a viable form of accommodation.  *See, e.g.,* COMAR § 14.03.02.05.B.(6).[4]   Yet, Defendants repeatedly resisted authorizing Plaintiff to telework -- without a viable rationale, as it was, and remains, abundantly clear to Plaintiff that all of her core duties could have been performed remotely.

---

[4] Notably, this same regulation also makes clear that an employer like CCBC "[s]hall make a reasonable accommodation to the known physical or mental limitations of a qualified individual with a disability."  COMAR § 14.03.02.05.A.(1).  In other words, this is not a voluntary undertaking.

28.     Significantly, the teleworking accommodation requested by Plaintiff, if it had been granted, would have been an effective, and hence reasonable, accommodation.  The minor extent to which Defendants would allow her to telework was not.

29.     Moreover, had Plaintiff been granted the needed accommodation of teleworking, she would not have submitted her aforementioned resignation notice on December 2, 2024.  In her notice, Plaintiff stated, among other things, that CCBC had "opted to deny my accommodation request and only intends to offer insufficient support," and that their denial in this regard "was not tenable for [her] long-term health, both physical and mental."

30.     Importantly, the effective date of her resignation expressly specified in her notice was "September 1, 2025," meaning that, at the time of the notice's submission, she was still going to be working at the Community College for another nine months.[5]

31.     Rather surprisingly, the reaction of Defendants was not to express understanding or empathy.   Instead, they tried to hasten Plaintiff's exit and render her unemployed immediately.  Specifically, CCBC told Plaintiff -- the very next day after her notice -- that she could leave her employment as soon as December 13, 2024, and falsely claimed that she had demonstrated a "desire to end the interactive process."  This reaction made clear to Plaintiff that Defendants were merely trying to get out of their legal obligation to provide reasonable and effective accommodations to her despite the fact that she would still be working for CCBC -- and still in need of those accommodations -- for nine more months.  Needless to say, Plaintiff balked at Defendants' troubling "offer" to force her out, and she continued working for the College.

32.     Plaintiff, both before and after her December 2nd resignation notice, opposed Defendants' insufficient provision of reasonable accommodations for, and her mistreatment on

---

[5] This also means, needless to say, that Plaintiff provided advanced notice of at least six months, consistent with the terms of her contract.

8

account of, her disabilities.  She first did so in or about late November of 2024 in a series of emails to CCBC management, and then again on December 13, 2024 in a written complaint (as will be detailed below), in late February during a meeting with HR, and on March 3, 2025 through a letter from her counsel to CCBC and others (as will also be detailed further below).

33.    Such expressions of opposition to discriminatory mistreatment along with the seeking of reasonable accommodations itself constitute protected activities under the federal and state anti-discrimination laws.

34.    On December 13, 2024, three months before her wrongful firing, Plaintiff filed a formal Complaint with CCBC's Employee Relations and Equity Office.  In her Complaint, among other things, she stated as follows:

> First, … my disability accommodations process was insufficient and unnecessarily protracted. Heather Kaplan was my ADA advisor and the communication was not up to par for such a time sensitive matter. Later I found that she is the lone ADA specialist in HR and only works part-time. I do not believe that to be sufficient support for the disabled employees of CCBC. I started the process of my accommodation request before I even accepted the offer letter, and I informed her I would need telework as a reasonable accommodation. I wasn't even informed of the college's telework policy until two weeks into the role.

> Second, HR insiste[d] on inadequate accommodations. My medical documentation makes it clear I have been through hellacious treatments for the sake of controlling an even more hellacious pain condition, so there is no reason for them to reject me for regular telework. …. There's also the protracted set up of my VDI, which should have initiated much earlier because *I initiated the discussions of my accommodations before accepting my offer letter.*

35.    Following the submission of her formal Complaint, CCBC took no further concrete actions to effectively accommodate Plaintiff's disabling conditions at any time throughout the remainder of her unjustly-truncated period of employment.  This willful inaction by the College resulted in a worsening of Plaintiff's workplace situation and even contributed to further damage to her health, both mentally and physically.

9

36.    Indeed, Plaintiff sustained a physical bodily injury when, through no fault of her own, she fell while on campus on January 8, 2025.  Her fall, which became the subject of a workers' compensation claim,[6] added injury to insult for Plaintiff.  Had she been authorized to telework -- in keeping with not only her express desire but that of her healthcare provider -- the fall would not, and could not, have occurred.   But this highly-effective reasonable accommodation had repeatedly been rejected.  In fact, and rather tragically, it was rejected as recently as one single day before Plaintiff's fall when, on January 7, 2025, CCBC advised her, via email, that teleworking four days per week was, supposedly, "not feasible."

37.    Following her injury-causing fall, Plaintiff was unable to work for a number of days and had to undergo medical treatment and attend physical therapy.  With respect to the use of leave as an accommodation for her disabling injury and treatment, Plaintiff was "taken to task" for it by management.  For instance and not limitation, on February 10, 2025, Plaintiff was "written up" in a memo by her immediate supervisor, Glenda Breaux, Ph.D., for, among other things, absences that were directly attributable to her injuries and need for treatment (and, to be clear, Plaintiff disagrees with other aspects of this unjustified memo as well).  At the time of her subsequent termination, Plaintiff had still not fully recovered from her fall.

38.    Thereafter, the aforementioned March 3, 2025 letter from Plaintiff's counsel arrived at CCBC and stated, among other things, the following:

> The reason I am writing this letter to you now on Ms. Ceasar's behalf is to, once again, oppose her discriminatory and retaliatory mistreatment to date by

---

[6] Following Plaintiff's notification to Defendants concerning this workplace injury in real time, thereby beginning the workers' compensation process, Plaintiff formally filed a claim with the Maryland Workers' Compensation Commission on or about March 11, 2025, Claim No.: W244979.  As of the filing of this suit, the workers' compensation case remains ongoing and is currently on appeal before this Honorable Court, Case No.: C-03-CV-25-005531.

CCBC,[7] and, more importantly, to respectfully request, once more, that she be accommodated with full-time teleworking. There is no legitimate rationale for denying Ms. Ceasar this accommodation given the nature and extent of her disabilities, nor would doing so create an undue hardship for CCBC. As such, it should be granted without further delay.

39.    Within just 11 days after CCBC's receipt of counsel's letter, on March 14, 2025, Plaintiff was given a letter, signed by Dr. Breaux, suspending her without pay and notifying her of the recommendation for her termination.

40.    In an in-person meeting between Defendants' management and Plaintiff on March 14, 2025, during which Plaintiff received Dr. Breaux's aforementioned letter at its start,[8] Plaintiff, while understandably dismayed given the impact that the loss of her job would have on her personal and professional life, was also upset that management took her to task over her use of her phone in the meeting.  She used it to contact her counsel, which management took issue with unjustly.  But, more importantly, management did not want her to use her phone app to provide her with real-time transcription of the meeting -- which is necessary on account of her hearing disability.  Rather stunningly to Plaintiff, Dr. Beaux claimed that she was being rude for using her phone.  Plaintiff understandably felt that CCBC was, yet again, denying her a reasonable accommodation for her disabilities.

---

[7] All of said discriminatory and retaliatory mistreatment was recounted in this letter, which also made express reference to the letter constituting notice under the Local Government Tort Claim Act.  In addition to sending the letter to CCBC, which acknowledged receipt thereof in an email dated March 7, 2025, copies of the letter were also served, via email or fax and certified mail, return receipt requested, upon the County Attorney for Baltimore County and the Baltimore County Claims Management Division, which is also known as the Liability Claims Department.  The next day, March 4, 2025, Deputy County Attorney Glenn T. Marrow acknowledged receipt of the March 3, 2025 letter.

[8] It should be noted that it was explained to Plaintiff during this meeting that, if President Kurtinitis decided not to terminate Plaintiff, despite the recommendation for the President to do so, Plaintiff's active employment would continue and she would be paid retroactively for her suspension period.  In this regard, it merits mentioning that the parties' contract expressly stated that the final authority for termination is the President's.  Plaintiff was further told in the meeting that the President's decision would be made in about a week.

11

41.    Fairly consistent with the timeline for President Kurtinitis's termination decision given to Plaintiff at the March 14th meeting, *see supra* ¶ 40 n.8, five days later on March 19, 2025, Plaintiff's firing by Defendants was then imposed upon her by way of a letter bearing that same date from the President.  As such, Plaintiff was officially fired on March 19, 2025, though the letter made the termination "effective" on March 14, 2025.

42.    Notably, President Kurtinitis's letter, while listing purported causes for Plaintiff's firing, namely, "not adhering to the college's Standards of Conduct & Ethical Behavior, specifically performance, attendance, and conduct" -- all of which were cited by the President without any further context or comment and all of which Plaintiff denies, it never once actually stated that the termination was "for cause."[9]

43.    Even after Plaintiff's termination, Defendants continued to mistreat her by, among other things, causing payroll irregularities (some of which have continued to this day) and overly complicating her return of the College's laptop.

44.    Defendants also failed and refused to provide Plaintiff with her paycheck -- for services she had already performed during the last week of her active employment -- until May 21, 2025 -- i.e., more than two full months after her March 19, 2025 termination.[10]

---

[9]  Though not necessary given what will be recounted below, *see infra* ¶¶ 47-59, on March 12, 2026, as a supplement to her March 3, 2025 letter, Plaintiff, through her counsel, nonetheless advised the County Attorney for Baltimore County and the County's Liability Claims Department, by written letter, of the events of March 14 and 19, 2025, which were the only two pertinent events which postdated the March 3, 2025 letter she had sent them previously through said counsel.  The March 12, 2026 letter asserted that Plaintiff's termination was violative of the applicable statutory and common law, and was accompanied by a copy of Plaintiff's below-described Charge of Discrimination in this case, *see infra* ¶¶ 48-50, which the letter stated could be reviewed for "further details regarding Ms. Ceasar's March 19, 2025 termination and the events that preceded it on March 14, 2025[.]"

[10]  Plaintiff takes the position that this delay is yet another breach of the parties' contract by Defendants given that Plaintiff is obviously entitled to be paid by Defendants in a timely manner for her work.  While Plaintiff is not bringing a claim herein under Maryland's Wage Payment & Collection Law given the existence of an (albeit unpublished) Appellate Court of Maryland decision a number of years ago concerning the Law's inapplicability to governmental entities, the fact remains that such misconduct

45.     Following her termination by Defendants, Plaintiff, despite her good faith efforts, was unable to secure replacement employment.

46.     As a direct and proximate result of Defendants' violations of Plaintiff's rights, which occurred during her employment and as a result of her discriminatory, retaliatory, and wrongful termination, Plaintiff has suffered, and will continue to suffer, both economic and non-economic harm, including, but not limited to, loss of wages, loss of accrued but unused leave, loss of other benefits of employment including health insurance benefits,[11] mental and emotional strain, stress, anguish, anxiety, depression, uncertainty, upset, inconvenience, insult, embarrassment, loss of enjoyment of life, loss of prestige, and loss of status, fluctuations in weight, sleeplessness, and nightmares.

47.     Following her receipt of President Kurtinitis's March 19, 2025 letter firing her, Plaintiff sought to reverse the termination decision by appealing it through an internal administrative appeals process at CCBC as it was, and remains, her view that the reasons given therefor by Defendants were pretextual.  In each of the available rounds of appeal, which all proceeded solely before persons directly affiliated with Defendants and ended with an in person oral argument by the parties before the members of the Board of Trustees themselves, Plaintiff presented all of the facts recited hereinabove, both orally and in writing, thereby putting Defendants on notice of her various claims.  This appeals process, which lasted into the fall of 2025 and exhausted her administrative remedies under CCBC's appeal policy, unsurprisingly did not cause any change in Plaintiff's circumstances, as she remained a terminated employee throughout, dating back to March 19, 2025.  As such, Plaintiff now turns to this Honorable

---

being otherwise violative of said Law only further supports the assertion that Defendants have acted in violation of their contractual obligations to Plaintiff.

[11]  The stripping away of her health insurance benefits, in particular, forced Plaintiff to forgo a surgical procedure that she had previously been scheduled to undergo.

13

Court, as a far more objective arbiter of the facts and circumstances at issue in her case, to secure the relief she desires and deserves.

48.    In relation to the ADA and MFEPA, in particular, on September 8, 2025, Plaintiff timely filed her executed Charge of Discrimination (hereinafter "Charge") with the U.S. Equal Employment Opportunity Commission (hereinafter "EEOC"), which was dual-filed with Maryland Commission on Civil Rights.[12]  The EEOC's case number was 531-2025-05616.

49.    In her Charge, which was six pages in length, Plaintiff asserted that she was discriminated and retaliated against by Defendants during the period of November 11, 2024, which was her first day of employment, through March 19, 2025, which was the date of the termination letter from President Kurtinitis.

50.    Plaintiff expressly listed, amongst the bases of discrimination on the Charge form, "Disability" and "Retaliation."  She then proceeded, in the "Particulars" section of the form, to recount essentially all of the facts recited hereinabove.

51.    Following the filing of the Charge, the EEOC conducted an investigation involving both parties.  For her part, Plaintiff submitted to the EEOC, in response to Defendants' position statement, a rebuttal letter along with 40-plus pages of supporting documentation.

52.    In relation to Counts I, II, IV, V, VII, and VIII below, the facts alleged in Plaintiff's Charge are fully consistent with those alleged by her in this Complaint.

53.    On March 10, 2026, Plaintiff requested a Notice of Right to Sue, as she was entitled to do under the applicable regulation, because the EEOC had yet to complete its investigation and 183 days had elapsed since the Charge was filed by her on September 8, 2025.

_____

[12]  Filing an administrative Charge with the EEOC and/or Maryland Commission on Civil Rights is not a necessary precursor to bringing a claim under the Rehabilitation Act.  *See, e.g., Prosa v. Austin*, Civ. A. No.: ELH-20-3015, 2022 WL 394465, at *15 n.24 (D. Md. Feb. 8, 2022) ("The Rehabilitation Act does not require administrative exhaustion by non-federal employees.").  Needless to say, the same hold true for Plaintiff's claims herein under Maryland common law.

The letter requesting the Notice expressly stated that, "[w]ith respect to her Charge, which was filed on September 8, 2025 and has therefore been pending before the EEOC for more than 180 days, Ms. Ceasar, by and through her undersigned counsel and pursuant to 29 C.F.R. § 1601.28, hereby requests the issuance of a Notice of Right to Sue in relation to the claims in her Charge."

54.    The next day, March 11, 2026, in accordance with 29 C.F.R. § 1601.28(d), the Notice of Right to Sue was issued to Plaintiff by the U.S. Department of Justice.

55.    With respect to Counts II, V, and VIII, Plaintiff is bringing these claims well within 90 days of her receipt of this Notice of Right to Sue.

56.    Under Maryland law, with respect to Counts I, IV, and VII, more than sufficient time has elapsed since the filing of Plaintiff's executed Charge on September 8, 2025 to allow for her bringing of these claims before the Circuit Court for Baltimore County. *See* Md. Code Ann., State Gov't § 20-1013(a).

57.    Under § 5-301 of the Local Government Tort Claim Act (hereinafter "LGTCA"), a type of "local government" entitled to actual or constructive notice of a plaintiff's tort claims, including those under the MFEPA, within one year is a "community college or board of trustees for a community college established or operating under Title 16 of the Education Article, not including Baltimore City Community College[.]" *See* Md. Code Ann., Courts & Jud. Proc. § 5-301(d)(9). In this Complaint, Plaintiff herein is, needless to say, suing a "community college [and] board of trustees for a community college[.]" As such, with respect to some -- but not all -- of the claims asserted hereinbelow, compliance with the LGTCA is necessary, and Plaintiff has, in fact, complied with same.

58.    Indeed, Plaintiff's Charge alone, which was served upon Defendants and to which Defendants responded with a detailed position statement filed with the EEOC in December 2025, clearly satisfies the requirements of the LGTCA (and/or renders it inapplicable). *See, e.g.,*

15

*Carter v. Harrison*, Civ. A. No. JRR-21-02724, 2022 WL 1556095, at \*1-\*2 (D. Md. May 17, 2022); *Hine v. Prince George's Cnty., Md.*, Civ. A. No. TDC-20-2929, 2021 WL 5882615, at \*3-\*4 (D. Md. Dec. 9, 2021).  In the Charge, Plaintiff expressly stated, among many other things in its six pages, that she

> was involuntarily terminated by CCBC under circumstances which [she] maintains are violative of the Americans with Disabilities Act, as amended (hereinafter "ADA"), the Maryland Fair Employment Practices Act (hereinafter "MFEPA"), the Rehabilitation Act, and Maryland's common law of wrongful discharge (for the termination of an employee for filing a workers' compensation claim) ….
>
> And Ms. Ceasar further takes the position that, before her firing, CCBC failed to reasonably accommodate her, failed to engage in the interactive process or provide an individualized assessment of her in light of her disabilities, unreasonably delayed the provision of reasonable accommodations, and mistreated and harassed her in violation of the above-referenced statutes. [13]

59.     Here, however, notice consisted of much more than just receipt of the Charge, as confirmed by Defendants' position statement.  Separate and apart from the Charge, as review of the above paragraphs of this Complaint make clear, Plaintiff has notified Defendants about the sum and substance of her various legal claims on her own and through her counsel on many occasions dating all the way back to the fall of 2024, even including via written and oral presentations directly to the Board of Trustees itself as part of the aforementioned multi-month internal appeals process (as well as via multiple written notifications to the County Attorney for Baltimore County and the County's Liability Claims Department, though these were likely unnecessary).

---

[13]   In their aforementioned position statement, Defendants addressed Plaintiff's claims in her Charge and, in so doing, inherently acknowledged their receipt of notice regarding same.  By way of example and not limitation, in relation to Plaintiff's claim, as asserted in Count X below, for wrongful discharge due to her having filed a workers' compensation claim, Defendants stated, among other things, in their position statement that Plaintiff "alleges that the College retaliated against her by … terminating her employment because she filed a worker's compensation claim."  Defendants then went on in their statement to defend their misconduct by stating, albeit incorrectly, that "the College's actions had nothing to do with Ceasar's filing or pursuit of a worker's compensation claim …."

60.    The causes of action set forth by Plaintiff below are based upon the facts recounted above and are being presented in accordance with the Maryland Rules, including but not limited to Rule 2-303(c), which provides that "[a] party may set forth two or more statements of a claim … alternatively or hypothetically.  When two or more statements are made in the alternative and one of them if made independently would be sufficient, the pleading is not made insufficient by the insufficiency of one or more of the alternative statements.  A party may also state as many separate claims … as the party has, regardless of consistency and whether based on legal or equitable grounds."

61.    The order in which the causes of action are presented below has no significance and is not meant to suggest that any one of them is any more important than any other.

**CAUSES OF ACTION**

**COUNT I -- Violation of the Maryland Fair Employment Practices Act
(Retaliation)**

62.    Plaintiff realleges and reasserts each and every allegation set forth in Paragraphs 1 through 61, as if each were set forth herein verbatim.

63.    Plaintiff was an "employee" and Defendants were her "employer" within the scope and meaning of the Maryland Fair Employment Practices Act (hereinafter "MFEPA"). *See* Md. Code Ann., State Gov't § 20-601.

64.    Plaintiff's impairments constitute a disability, as that term is defined by, and construed under, the MFEPA and other applicable law.

65.    At all times pertinent, Plaintiff was a qualified individual with a disability who could perform the essential functions of her job, with or without accommodations.

66.    Plaintiff repeatedly made Defendants aware of her need for reasonable accommodations, as detailed above.

17

67. The sought forms of accommodation are viable and legally-protected under the applicable law and regulations.

68. With reasonable accommodations, Plaintiff could perform all of the essential functions of her job.

69. Plaintiff engaged in the protected activities of seeking (and, to some extent, making use of) reasonable accommodations from her employer and opposing her discriminatory mistreatment on account thereof and her disability.

70. The MFEPA makes it unlawful to retaliate against employees in response to their protected activities, and Plaintiff, on account of her disabling impairments and engagement in such protected activities, is a member of classes of individuals who fall within the protections thereof.

71. The adverse actions taken by Defendants -- including, but not limited to, (a) unjustly failing and refusing to afford her the effective reasonable accommodation of teleworking, which was clearly feasible under the circumstances given Plaintiff's core duties; (b) improperly and unnecessarily delaying the provision of other reasonable accommodations related to her disabilities; (c) compelling her to resign, effective September 1, 2025, due their failure and refusal to effective, reasonably, and/or timely accommodate her disabilities; (d) trying to wrongly hasten her exit and render her unemployed immediately when she gave them notice of her resignation effective nine months later on September 1, 2025; (e) falsely claiming that she desired ending the interactive process after her forced resignation submission; (f) unjustly failing and refusing to engage in good faith in the interactive process or provide her with an individualized assessment in light of her disabilities; (g) taking her to task with respect to her use of leave as an accommodation for her disabling injury and treatment therefor following her fall on Defendants' grounds in January 2025; (h) additionally taking her to task for using her phone

18

in the March 14, 2025 meeting, which she was using to provide her with critically important real-time transcription of said meeting due to her hearing impairment; (i) writing her up unjustly; (j) suspending her without pay illegitimately; and, most egregiously, (k) wrongly terminating her employment on March 19, 2025 (and even creating unreasonable and unnecessary difficulties for her thereafter) -- were undertaken in retaliation for Plaintiff having engaged in the aforementioned protected activities.

72.    To the extent that the above-listed acts and omissions by Defendants constituted retaliatory harassment, the unwelcomed and offensive misconduct, based on the totality of the circumstances, unreasonably created a working environment that a reasonable person would perceive to be abusive or hostile.  And Defendants failed and/or refused to take action to prevent, remedy, or halt the harassment.

73.    In relation to the suspension and termination, in particular, Defendants were motivated by Plaintiff's protected activity to rid themselves of her, as demonstrated by, among other things, the short timeframe between the protected activities and these retaliatory actions.

74.    As demonstrated by their acts and omissions, as recounted in this Complaint, Defendants clearly felt contemptuous towards Plaintiff as well as their legal obligation to accommodate her.

75.    As a direct and proximate result of Defendants' violations of Plaintiff's rights, Plaintiff has suffered, and will continue to suffer, both economic and non-economic harm, including, but not limited to, loss of wages, loss of accrued but unused leave, loss of other benefits of employment including health insurance benefits, mental and emotional strain, stress, anguish, anxiety, depression, uncertainty, upset, inconvenience, insult, embarrassment, loss of enjoyment of life, loss of prestige, and loss of status, fluctuations in weight, sleeplessness, and nightmares.

19

WHEREFORE, Plaintiff prays that this Honorable Court or a jury determines that the practices by Defendants complained of herein were unlawful; that she be awarded judgment against Defendants, jointly and severally, for all available forms of monetary damages (including, but not limited to, back pay, back benefits, and compensatory damages) in an amount in excess of $75,000,[14] plus pre- and post-judgment interest, reasonable attorney's fees, expert witness fees, and costs; that she be awarded front pay and front benefits in lieu of reinstatement; and for all other and further relief that this Court or a jury deems appropriate.

**COUNT II -- Violation of the Americans with Disabilities Act, as Amended**
**(Retaliation)**

76.     Plaintiff realleges and reasserts each and every allegation set forth in Paragraphs 1 through 61, as if each were set forth herein verbatim.

77.     Plaintiff was an "employee" and Defendants were her "employer" within the scope and meaning of the Americans with Disabilities Act , as amended (hereinafter "ADA").

78.     Plaintiff's impairments constitute a disability, as that term is defined by, and construed under, the ADA and other applicable law.

79.     At all times pertinent, Plaintiff was a qualified individual with a disability who could perform the essential functions of her job, with or without accommodations.

80.     Plaintiff repeatedly made Defendants aware of her need for reasonable accommodations, as detailed above.

81.     The sought forms of accommodation are viable and legally-protected under the applicable law and regulations.

82.     With reasonable accommodations, Plaintiff could perform all of the essential functions of her job.

---

[14] *See* Md. R. 2-305.

83.    Plaintiff engaged in the protected activities of seeking (and, to some extent, making use of) reasonable accommodations from her employer and opposing her discriminatory mistreatment on account thereof and her disability.

84.    The ADA makes it unlawful to retaliate against employees in response to their protected activities, and Plaintiff, on account of her disabling impairments and engagement in such protected activities, is a member of classes of individuals who fall within the protections thereof.

85.    The adverse actions taken by Defendants -- including, but not limited to, (a) unjustly failing and refusing to afford her the effective reasonable accommodation of teleworking, which was clearly feasible under the circumstances given Plaintiff's core duties; (b) improperly and unnecessarily delaying the provision of other reasonable accommodations related to her disabilities; (c) compelling her to resign, effective September 1, 2025, due their failure and refusal to effective, reasonably, and/or timely accommodate her disabilities; (d) trying to wrongly hasten her exit and render her unemployed immediately when she gave them notice of her resignation effective nine months later on September 1, 2025; (e) falsely claiming that she desired ending the interactive process after her forced resignation submission; (f) unjustly failing and refusing to engage in good faith in the interactive process or provide her with an individualized assessment in light of her disabilities; (g) taking her to task with respect to her use of leave as an accommodation for her disabling injury and treatment therefor following her fall on Defendants' grounds in January 2025; (h) additionally taking her to task for using her phone in the March 14, 2025 meeting, which she was using to provide her with critically important real-time transcription of said meeting due to her hearing impairment; (i) writing her up unjustly; (j) suspending her without pay illegitimately; and, most egregiously, (k) wrongly terminating her employment on March 19, 2025 (and even creating unreasonable and unnecessary difficulties for

21

her thereafter) -- were undertaken in retaliation for Plaintiff having engaged in the aforementioned protected activities.

86.    To the extent that the above-listed acts and omissions by Defendants constituted retaliatory harassment, Defendants' unwelcomed and offensive misconduct based upon Plaintiff's protected activities altered the conditions of Plaintiff's employment both explicitly and in a manner that created an abusive and/or hostile working environment for her, subjectively from her perspective as well as objectively.  And Defendants failed and/or refused to take action to prevent, remedy, or halt the harassment.

87.    In relation to the suspension and termination, in particular, Defendants were motivated by Plaintiff's protected activity to rid themselves of her, as demonstrated by, among other things, the short timeframe between the protected activities and these retaliatory actions.

88.    As demonstrated by their acts and omissions, as recounted in this Complaint, Defendants clearly felt contemptuous towards Plaintiff as well as their legal obligation to accommodate her.

89.    As a direct and proximate result of Defendants' violations of Plaintiff's rights, Plaintiff has suffered, and will continue to suffer, both economic and non-economic harm, including, but not limited to, loss of wages, loss of accrued but unused leave, loss of other benefits of employment including health insurance benefits, mental and emotional strain, stress, anguish, anxiety, depression, uncertainty, upset, inconvenience, insult, embarrassment, loss of enjoyment of life, loss of prestige, and loss of status, fluctuations in weight, sleeplessness, and nightmares.

WHEREFORE, Plaintiff prays that this Honorable Court or a jury determines that the practices by Defendants complained of herein were unlawful; that she be awarded judgment against Defendants, jointly and severally, for all available forms of monetary damages

22

(including, but not limited to, back pay, back benefits, and compensatory damages) in an amount in excess of $75,000,[15] plus pre- and post-judgment interest, reasonable attorney's fees, expert witness fees, and costs; that she be awarded front pay and front benefits in lieu of reinstatement; and for all other and further relief that this Court or a jury deems appropriate.

**COUNT III -- Violation of § 504 of the Rehabilitation Act, as Amended**
**(Retaliation)**

90.     Plaintiff realleges and reasserts each and every allegation set forth in Paragraphs 1 through 61, as if each were set forth herein verbatim.

91.     Plaintiff was an "employee" and Defendants were her "employer" within the scope and meaning of the Rehabilitation Act, as amended (hereinafter "Rehabilitation Act").

92.     At all times pertinent, Defendants were the recipient of federal financial assistance.  *See supra* ¶ 8.

93.     Plaintiff's impairments constitute a disability, as that term is defined by, and construed under, the Rehabilitation Act and other applicable law.

94.     At all times pertinent, Plaintiff was a qualified individual with a disability who could perform the essential functions of her job, with or without accommodations.

95.     Plaintiff repeatedly made Defendants aware of her need for reasonable accommodations, as detailed above.

96.     The sought forms of accommodation are viable and legally-protected under the applicable law and regulations.

97.     With reasonable accommodations, Plaintiff could perform all of the essential functions of her job.

---

[15] *See* Md. R. 2-305.

98.     Plaintiff engaged in the protected activities of seeking (and, to some extent, making use of) reasonable accommodations from her employer and opposing her discriminatory mistreatment on account thereof and her disability.

99.     The Rehabilitation Act makes it unlawful to retaliate against employees in response to their protected activities, and Plaintiff, on account of her disabling impairments and engagement in such protected activities, is a member of classes of individuals who fall within the protections thereof.

100.     The adverse actions taken by Defendants -- including, but not limited to, (a) unjustly failing and refusing to afford her the effective reasonable accommodation of teleworking, which was clearly feasible under the circumstances given Plaintiff's core duties; (b) improperly and unnecessarily delaying the provision of other reasonable accommodations related to her disabilities; (c) compelling her to resign, effective September 1, 2025, due their failure and refusal to effective, reasonably, and/or timely accommodate her disabilities; (d) trying to wrongly hasten her exit and render her unemployed immediately when she gave them notice of her resignation effective nine months later on September 1, 2025; (e) falsely claiming that she desired ending the interactive process after her forced resignation submission; (f) unjustly failing and refusing to engage in good faith in the interactive process or provide her with an individualized assessment in light of her disabilities; (g) taking her to task with respect to her use of leave as an accommodation for her disabling injury and treatment therefor following her fall on Defendants' grounds in January 2025; (h) additionally taking her to task for using her phone in the March 14, 2025 meeting, which she was using to provide her with critically important real-time transcription of said meeting due to her hearing impairment; (i) writing her up unjustly; (j) suspending her without pay illegitimately; and, most egregiously, (k) wrongly terminating her employment on March 19, 2025 (and even creating unreasonable and unnecessary difficulties for

24

her thereafter) -- were undertaken in retaliation for Plaintiff having engaged in the aforementioned protected activities.

101.    To the extent that the above-listed acts and omissions by Defendants constituted retaliatory harassment, Defendants' unwelcomed and offensive misconduct based upon Plaintiff's protected activities altered the conditions of Plaintiff's employment both explicitly and in a manner that created an abusive and/or hostile working environment for her, subjectively from her perspective as well as objectively.  And Defendants failed and/or refused to take action to prevent, remedy, or halt the harassment.

102.    In relation to the suspension and termination, in particular, Defendants were motivated by Plaintiff's protected activity to rid themselves of her, as demonstrated by, among other things, the short timeframe between the protected activities and these retaliatory actions.

103.    As demonstrated by their acts and omissions, as recounted in this Complaint, Defendants clearly felt contemptuous towards Plaintiff as well as their legal obligation to accommodate her.

104.    As a direct and proximate result of Defendants' violations of Plaintiff's rights, Plaintiff has suffered, and will continue to suffer, both economic and non-economic harm, including, but not limited to, loss of wages, loss of accrued but unused leave, loss of other benefits of employment including health insurance benefits, mental and emotional strain, stress, anguish, anxiety, depression, uncertainty, upset, inconvenience, insult, embarrassment, loss of enjoyment of life, loss of prestige, and loss of status, fluctuations in weight, sleeplessness, and nightmares.

WHEREFORE, Plaintiff prays that this Honorable Court or a jury determines that the practices by Defendants complained of herein were unlawful; that she be awarded judgment against Defendants, jointly and severally, for all available forms of monetary damages

25

(including, but not limited to, back pay, back benefits, and compensatory damages) in an amount in excess of $75,000,[16] plus pre- and post-judgment interest, reasonable attorney's fees, expert witness fees, and costs; that she be awarded front pay and front benefits in lieu of reinstatement; and for all other and further relief that this Court or a jury deems appropriate.

**COUNT IV -- Violation of the Maryland Fair Employment Practices Act**
**(Disability Discrimination)**

105.    Plaintiff realleges and reasserts each and every allegation set forth in Paragraphs 1 through 61, as if each were set forth herein verbatim.

106.    Plaintiff was an "employee" and Defendants were her "employer" within the scope and meaning of the Maryland Fair Employment Practices Act (hereinafter "MFEPA"). *See* Md. Code Ann., State Gov't § 20-601.

107.    Plaintiff's impairments constitute a disability, as that term is defined by, and construed under, the MFEPA and other applicable law.

108.    At all times pertinent, Plaintiff was a qualified individual with a disability who could perform the essential functions of her job, with or without accommodations.

109.    The MFEPA makes it unlawful to discriminate against employees because of their disability, and Plaintiff, on account of her disabling impairments and corresponding need for accommodations, is a member of a class of individuals who falls within the protections thereof.

110.    In subjecting Plaintiff to the disparate mistreatment described herein -- including, but not limited to, (a) unjustly failing and refusing to afford her the effective reasonable accommodation of teleworking, which was clearly feasible under the circumstances given Plaintiff's core duties; (b) improperly and unnecessarily delaying the provision of other reasonable accommodations related to her disabilities; (c) compelling her to resign, effective

---

[16] *See* Md. R. 2-305.

26

September 1, 2025, due their failure and refusal to effective, reasonably, and/or timely accommodate her disabilities; (d) trying to wrongly hasten her exit and render her unemployed immediately when she gave them notice of her resignation effective nine months later on September 1, 2025; (e) falsely claiming that she desired ending the interactive process after her forced resignation submission; (f) unjustly failing and refusing to engage in good faith in the interactive process or provide her with an individualized assessment in light of her disabilities; (g) taking her to task with respect to her use of leave as an accommodation for her disabling injury and treatment therefor following her fall on Defendants' grounds in January 2025; (h) additionally taking her to task for using her phone in the March 14, 2025 meeting, which she was using to provide her with critically important real-time transcription of said meeting due to her hearing impairment; (i) writing her up unjustly; (j) suspending her without pay illegitimately; and, most egregiously, (k) wrongly terminating her employment on March 19, 2025 (and even creating unreasonable and unnecessary difficulties for her thereafter) -- Defendants engaged in disability discrimination in violation of Maryland law. *See* Md. Code Ann., State Gov't §§ 20-601, et seq.

111.    Defendants' improper acts and omissions were also undertaken to harass[17] and/or interfere with Plaintiff in the exercise or enjoyment of her rights under the law.

112.    Plaintiff's disabilities, and the workplace implications thereof, caused Defendants' discriminatory acts and omissions, or, in the alternative, was a motivating factor for same.

---

[17]    It must be noted that Defendants' harassment of Plaintiff need not have been severe or pervasive to be actionable under Maryland law. *See* Md. Code Ann., State Gov't § 20-601(h). A plaintiff can prevail by establishing that, based on the totality of the circumstances, the conduct unreasonably creates a working environment that a reasonable person would perceive to be abusive or hostile. *See id*.

27

113.   As demonstrated by said acts and omissions, as recounted in this Complaint, Defendants clearly felt contemptuous towards Plaintiff as well as their legal obligations to her as a disabled worker, and the adverse actions they took against her were pretextual and resulted, in reality, from underlying discriminatory motivations.

114.   With respect to Defendants' unreasonable and unnecessary delays in providing accommodations to Plaintiff, in particular, the delay itself is independently discriminatory and actionable under the applicable law, and Plaintiff is seeking relief herein for same. *See Cohen v. Montgomery Cnty. Dept. of Health & Human Servs.*, 149 Md. App. 578, 594-95 (2003). *See also* EEOC, "Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act" (Oct. 17, 2002) ("An employer should respond expeditiously to a request for reasonable accommodation.  If the employer and the individual with a disability need to engage in an interactive process, this too should proceed as quickly as possible. Similarly, the employer should act promptly to provide the reasonable accommodation. Unnecessary delays can result in a violation of the ADA." (footnotes omitted)).

115.   As a direct and proximate result of Defendants' violations of Plaintiff's rights, Plaintiff has suffered, and will continue to suffer, both economic and non-economic harm, including, but not limited to, loss of wages, loss of accrued but unused leave, loss of other benefits of employment including health insurance benefits, mental and emotional strain, stress, anguish, anxiety, depression, uncertainty, upset, inconvenience, insult, embarrassment, loss of enjoyment of life, loss of prestige, and loss of status, fluctuations in weight, sleeplessness, and nightmares.

WHEREFORE, Plaintiff prays that this Honorable Court or a jury determines that the practices by Defendants complained of herein were unlawful; that she be awarded judgment against Defendants, jointly and severally, for all available forms of monetary damages

28

(including, but not limited to, back pay, back benefits, and compensatory damages) in an amount in excess of $75,000,[18] plus pre- and post-judgment interest, reasonable attorney's fees, expert witness fees, and costs; that she be awarded front pay and front benefits in lieu of reinstatement; and for all other and further relief that this Court or a jury deems appropriate.

### COUNT V -- Violation of the Americans with Disabilities Act, as Amended (Discrimination)

116.    Plaintiff realleges and reasserts each and every allegation set forth in Paragraphs 1 through 61, as if each were set forth herein verbatim.

117.    Plaintiff was an "employee" and Defendants were her "employer" within the scope and meaning of the Americans with Disabilities Act, as amended (hereinafter "ADA").

118.    Plaintiff's impairments constitute a disability, as that term is defined by, and construed under, the ADA and other applicable law.

119.    At all times pertinent, Plaintiff was a qualified individual with a disability who could perform the essential functions of her job, with or without accommodations.

120.    The ADA makes it unlawful to discriminate against employees because of their disability, and Plaintiff, on account of her disabling impairments and corresponding need for accommodations, is a member of a class of individuals who falls within the protections thereof.

121.    In subjecting Plaintiff to the disparate mistreatment described herein -- including, but not limited to, (a) unjustly failing and refusing to afford her the effective reasonable accommodation of teleworking, which was clearly feasible under the circumstances given Plaintiff's core duties; (b) improperly and unnecessarily delaying the provision of other reasonable accommodations related to her disabilities; (c) compelling her to resign, effective September 1, 2025, due their failure and refusal to effective, reasonably, and/or timely

---

[18] *See* Md. R. 2-305.

29

accommodate her disabilities; (d) trying to wrongly hasten her exit and render her unemployed immediately when she gave them notice of her resignation effective nine months later on September 1, 2025; (e) falsely claiming that she desired ending the interactive process after her forced resignation submission; (f) unjustly failing and refusing to engage in good faith in the interactive process or provide her with an individualized assessment in light of her disabilities; (g) taking her to task with respect to her use of leave as an accommodation for her disabling injury and treatment therefor following her fall on Defendants' grounds in January 2025; (h) additionally taking her to task for using her phone in the March 14, 2025 meeting, which she was using to provide her with critically important real-time transcription of said meeting due to her hearing impairment; (i) writing her up unjustly; (j) suspending her without pay illegitimately; and, most egregiously, (k) wrongly terminating her employment on March 19, 2025 (and even creating unreasonable and unnecessary difficulties for her thereafter) -- Defendants engaged in disability discrimination in violation of the ADA.

122.    Defendants' improper acts and omissions were also undertaken to harass[19] and/or interfere with Plaintiff in the exercise or enjoyment of her rights under the law.

123.    Plaintiff's disabilities, and the workplace implications thereof, caused Defendants' discriminatory acts and omissions, or, in the alternative, was a motivating factor for same.

124.    As demonstrated by said acts and omissions, as recounted in this Complaint, Defendants clearly felt contemptuous towards Plaintiff as well as their legal obligations to her as

---

[19]    Defendants' unwelcomed and offensive misconduct altered the conditions of Plaintiff's employment both explicitly and in a manner that created an abusive and/or hostile working environment for her, subjectively from her perspective as well as objectively.  And Defendants failed and/or refused to take action to prevent, remedy, or halt the harassment.

a disabled worker, and the adverse actions they took against her were pretextual and resulted, in reality, from underlying discriminatory motivations.

125.    With respect to Defendants' unreasonable and unnecessary delays in providing accommodations to Plaintiff, in particular, the delay itself is independently discriminatory and actionable under the applicable law, and Plaintiff is seeking relief herein for same. *See* EEOC, "Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act" (Oct. 17, 2002) ("An employer should respond expeditiously to a request for reasonable accommodation.  If the employer and the individual with a disability need to engage in an interactive process, this too should proceed as quickly as possible. Similarly, the employer should act promptly to provide the reasonable accommodation. Unnecessary delays can result in a violation of the ADA." (footnotes omitted)).

126.    As a direct and proximate result of Defendants' violations of Plaintiff's rights, Plaintiff has suffered, and will continue to suffer, both economic and non-economic harm, including, but not limited to, loss of wages, loss of accrued but unused leave, loss of other benefits of employment including health insurance benefits, mental and emotional strain, stress, anguish, anxiety, depression, uncertainty, upset, inconvenience, insult, embarrassment, loss of enjoyment of life, loss of prestige, and loss of status, fluctuations in weight, sleeplessness, and nightmares.

WHEREFORE, Plaintiff prays that this Honorable Court or a jury determines that the practices by Defendants complained of herein were unlawful; that she be awarded judgment against Defendants, jointly and severally, for all available forms of monetary damages (including, but not limited to, back pay, back benefits, and compensatory damages) in an amount

in excess of $75,000,[20] plus pre- and post-judgment interest, reasonable attorney's fees, expert witness fees, and costs; that she be awarded front pay and front benefits in lieu of reinstatement; and for all other and further relief that this Court or a jury deems appropriate.

**COUNT VI -- Violation of § 504 of the Rehabilitation Act, as Amended**
**(Discrimination)**

127.    Plaintiff realleges and reasserts each and every allegation set forth in Paragraphs 1 through 61, as if each were set forth herein verbatim.

128.    Plaintiff was an "employee" and Defendants were her "employer" within the scope and meaning of the Rehabilitation Act, as amended (hereinafter "Rehabilitation Act").

129.    At all times pertinent, Defendants were the recipient of federal financial assistance.  *See supra* ¶ 8.

130.    Plaintiff's impairments constitute a disability, as that term is defined by, and construed under, the Rehabilitation Act and other applicable law.

131.    At all times pertinent, Plaintiff was a qualified individual with a disability who could perform the essential functions of her job, with or without accommodations.

132.    The Rehabilitation Act makes it unlawful to discriminate against employees because of their disability, and Plaintiff, on account of her disabling impairments and corresponding need for accommodations, is a member of a class of individuals who falls within the protections thereof.

133.    In subjecting Plaintiff to the disparate mistreatment described herein -- including, but not limited to, (a) unjustly failing and refusing to afford her the effective reasonable accommodation of teleworking, which was clearly feasible under the circumstances given Plaintiff's core duties; (b) improperly and unnecessarily delaying the provision of other

---

[20] *See* Md. R. 2-305.

reasonable accommodations related to her disabilities; (c) compelling her to resign, effective September 1, 2025, due their failure and refusal to effective, reasonably, and/or timely accommodate her disabilities; (d) trying to wrongly hasten her exit and render her unemployed immediately when she gave them notice of her resignation effective nine months later on September 1, 2025; (e) falsely claiming that she desired ending the interactive process after her forced resignation submission; (f) unjustly failing and refusing to engage in good faith in the interactive process or provide her with an individualized assessment in light of her disabilities; (g) taking her to task with respect to her use of leave as an accommodation for her disabling injury and treatment therefor following her fall on Defendants' grounds in January 2025; (h) additionally taking her to task for using her phone in the March 14, 2025 meeting, which she was using to provide her with critically important real-time transcription of said meeting due to her hearing impairment; (i) writing her up unjustly; (j) suspending her without pay illegitimately; and, most egregiously, (k) wrongly terminating her employment on March 19, 2025 (and even creating unreasonable and unnecessary difficulties for her thereafter) -- Defendants engaged in disability discrimination in violation of the ADA.

134.    Defendants' improper acts and omissions were also undertaken to harass[21] and/or interfere with Plaintiff in the exercise or enjoyment of her rights under the law.

135.    Plaintiff's disabilities, and the workplace implications thereof, caused Defendants' discriminatory acts and omissions.

136.    As demonstrated by said acts and omissions, as recounted in this Complaint, Defendants clearly felt contemptuous towards Plaintiff as well as their legal obligations to her as

---

[21]    Defendants' unwelcomed and offensive misconduct altered the conditions of Plaintiff's employment both explicitly and in a manner that created an abusive and/or hostile working environment for her, subjectively from her perspective as well as objectively.  And Defendants failed and/or refused to take action to prevent, remedy, or halt the harassment.

a disabled worker, and the adverse actions they took against her were pretextual and resulted, in reality, from underlying discriminatory motivations.

137. With respect to Defendants' unreasonable and unnecessary delays in providing accommodations to Plaintiff, in particular, the delay itself is independently discriminatory and actionable under the applicable law, and Plaintiff is seeking relief herein for same. *See* EEOC, "Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act" (Oct. 17, 2002) ("An employer should respond expeditiously to a request for reasonable accommodation. If the employer and the individual with a disability need to engage in an interactive process, this too should proceed as quickly as possible. Similarly, the employer should act promptly to provide the reasonable accommodation. Unnecessary delays can result in a violation of the ADA." (footnotes omitted)).

138. As a direct and proximate result of Defendants' violations of Plaintiff's rights, Plaintiff has suffered, and will continue to suffer, both economic and non-economic harm, including, but not limited to, loss of wages, loss of accrued but unused leave, loss of other benefits of employment including health insurance benefits, mental and emotional strain, stress, anguish, anxiety, depression, uncertainty, upset, inconvenience, insult, embarrassment, loss of enjoyment of life, loss of prestige, and loss of status, fluctuations in weight, sleeplessness, and nightmares.

WHEREFORE, Plaintiff prays that this Honorable Court or a jury determines that the practices by Defendants complained of herein were unlawful; that she be awarded judgment against Defendants, jointly and severally, for all available forms of monetary damages (including, but not limited to, back pay, back benefits, and compensatory damages) in an amount

in excess of $75,000,[22] plus pre- and post-judgment interest, reasonable attorney's fees, expert witness fees, and costs; that she be awarded front pay and front benefits in lieu of reinstatement; and for all other and further relief that this Court or a jury deems appropriate.

**COUNT VII -- Violation of the Maryland Fair Employment Practices Act
(Failure to Accommodate)** [23]

139.    Plaintiff realleges and reasserts each and every allegation set forth in Paragraphs 1 through 61, as if each were set forth herein verbatim.

140.    Plaintiff was an "employee" and Defendants were her "employer" within the scope and meaning of the Maryland Fair Employment Practices Act (hereinafter "MFEPA"). *See* Md. Code Ann., State Gov't § 20-601.

141.    Plaintiff's impairments constitute a disability, as that term is defined by, and construed under, the MFEPA and other applicable law.

142.    At all times pertinent, Plaintiff was a qualified individual with a disability who could perform the essential functions of her job, with or without accommodations.

143.    Plaintiff repeatedly made Defendants aware of her need for reasonable accommodations, as detailed above.

144.    The sought forms of accommodation are viable and legally-protected under the applicable law and regulations.

145.    With reasonable accommodations, Plaintiff could perform all of the essential functions of her job.

---

[22]  *See* Md. R. 2-305.

[23]  It should be noted that, under well-settled Maryland case law, a "failure to accommodate claim does not … require any showing of discriminatory intent." *Peninsula Regional Med. Ctr. v. Adkins*, 448 Md. 197, 213 (2016).

146.    In response to Plaintiff's endeavor to secure reasonable accommodations, Defendants neither actively engaged in good faith in the interactive process nor made an individualized assessment of her needs as a disabled worker, which is unlawful.

147.    Defendants never, at any time, actually provided the effective reasonable accommodation of teleworking to Plaintiff that she had requested, despite their clear obligation to have done so, and they unreasonably and unnecessarily delayed the provision of other accommodations.[24]

148.    Instead, after mistreating her for many months, Defendants wrongly suspended Plaintiff without pay and then terminated her, which obviously frustrated and interfered with such accommodations' very function and purpose.  In so doing, Defendants again clearly failed to ever fully accommodate Plaintiff, which is an unlawful employment practice under the MFEPA and other applicable law.

149.    As demonstrated by their acts and omissions, Defendants clearly felt contemptuous towards Plaintiff as well as their legal obligation to accommodate her.

150.    As a direct and proximate result of Defendants' violations of Plaintiff's rights, Plaintiff has suffered, and will continue to suffer, both economic and non-economic harm, including, but not limited to, loss of wages, loss of accrued but unused leave, loss of other benefits of employment including health insurance benefits, mental and emotional strain, stress, anguish, anxiety, depression, uncertainty, upset, inconvenience, insult, embarrassment, loss of

---

[24] With respect to these delays, the very delay itself is independently discriminatory and actionable under the applicable law, and Plaintiff is seeking relief herein for same. *See Cohen v. Montgomery Cnty. Dept. of Health & Human Servs*., 149 Md. App. 578, 594-95 (2003). *See also* EEOC, "Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act" (Oct. 17, 2002) ("An employer should respond expeditiously to a request for reasonable accommodation.  If the employer and the individual with a disability need to engage in an interactive process, this too should proceed as quickly as possible.  Similarly, the employer should act promptly to provide the reasonable accommodation.  Unnecessary delays can result in a violation of the ADA." (footnotes omitted)).

36

enjoyment of life, loss of prestige, and loss of status, fluctuations in weight, sleeplessness, and nightmares.

WHEREFORE, Plaintiff prays that this Honorable Court or a jury determines that the practices by Defendants complained of herein were unlawful; that she be awarded judgment against Defendants, jointly and severally, for all available forms of monetary damages (including, but not limited to, back pay, back benefits, and compensatory damages) in an amount in excess of $75,000,[25] plus pre- and post-judgment interest, reasonable attorney's fees, expert witness fees, and costs; that she be awarded front pay and front benefits in lieu of reinstatement; and for all other and further relief that this Court or a jury deems appropriate.

### COUNT VIII -- Violation of the Americans with Disabilities Act, as Amended (Failure to Accommodate) [26]

151. Plaintiff realleges and reasserts each and every allegation set forth in Paragraphs 1 through 61, as if each were set forth herein verbatim.

152. Plaintiff was an "employee" and Defendants were her "employer" within the scope and meaning of the Americans with Disabilities Act, as amended (hereinafter "ADA").

153. Plaintiff's impairments constitute a disability, as that term is defined by, and construed under, the ADA and other applicable law.

154. At all times pertinent, Plaintiff was a qualified individual with a disability who could perform the essential functions of her job, with or without accommodations.

155. Plaintiff repeatedly made Defendants aware of her need for reasonable accommodations, as detailed above.

---

[25] *See* Md. R. 2-305.

[26] It should be noted that, under well-settled federal case law, a "failure-to-accommodate claim requires no evidence of discriminatory intent." *Perdue v. Sanofi-Aventis U.S., LLC*, 999 F.3d 954, 959 n.2 (4th Cir. 2021).

156.    The sought forms of accommodation are viable and legally-protected under the applicable law and regulations.

157.    With reasonable accommodations, Plaintiff could perform all of the essential functions of her job.

158.    In response to Plaintiff's endeavor to secure reasonable accommodations, Defendants neither actively engaged in good faith in the interactive process nor made an individualized assessment of her needs as a disabled worker, which is unlawful.

159.    Defendants never, at any time, actually provided the effective reasonable accommodation of teleworking to Plaintiff that she had requested, despite their clear obligation to have done so, and they unreasonably and unnecessarily delayed the provision of other accommodations.[27]

160.    Instead, after mistreating her for many months, Defendants wrongly suspended Plaintiff without pay and then terminated her, which obviously frustrated and interfered with such accommodations' very function and purpose.  In so doing, Defendants again clearly failed to ever fully accommodate Plaintiff, which is an unlawful employment practice under the ADA and other applicable law.

161.    As demonstrated by their acts and omissions, Defendants clearly felt contemptuous towards Plaintiff as well as their legal obligation to accommodate her.

---

[27] With respect to these delays, the very delay itself is independently discriminatory and actionable under the applicable law, and Plaintiff is seeking relief herein for same.  *See* EEOC, "Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act" (Oct. 17, 2002) ("An employer should respond expeditiously to a request for reasonable accommodation.  If the employer and the individual with a disability need to engage in an interactive process, this too should proceed as quickly as possible.  Similarly, the employer should act promptly to provide the reasonable accommodation.  Unnecessary delays can result in a violation of the ADA." (footnotes omitted)).

38

162.    As a direct and proximate result of Defendants' violations of Plaintiff's rights, Plaintiff has suffered, and will continue to suffer, both economic and non-economic harm, including, but not limited to, loss of wages, loss of accrued but unused leave, loss of other benefits of employment including health insurance benefits, mental and emotional strain, stress, anguish, anxiety, depression, uncertainty, upset, inconvenience, insult, embarrassment, loss of enjoyment of life, loss of prestige, and loss of status, fluctuations in weight, sleeplessness, and nightmares.

WHEREFORE, Plaintiff prays that this Honorable Court or a jury determines that the practices by Defendants complained of herein were unlawful; that she be awarded judgment against Defendants, jointly and severally, for all available forms of monetary damages (including, but not limited to, back pay, back benefits, and compensatory damages) in an amount in excess of $75,000,[28] plus pre- and post-judgment interest, reasonable attorney's fees, expert witness fees, and costs; that she be awarded front pay and front benefits in lieu of reinstatement; and for all other and further relief that this Court or a jury deems appropriate.

### COUNT IX -- Violation of § 504 of the Rehabilitation Act, as Amended
### (Failure to Accommodate) [29]

163.    Plaintiff realleges and reasserts each and every allegation set forth in Paragraphs 1 through 61, as if each were set forth herein verbatim.

164.    Plaintiff was an "employee" and Defendants were her "employer" within the scope and meaning of the Rehabilitation Act, as amended (hereinafter "Rehabilitation Act").

---

[28] *See* Md. R. 2-305.

[29] It should be noted that, under well-settled federal case law, a "failure-to-accommodate claim requires no evidence of discriminatory intent." *Perdue v. Sanofi-Aventis U.S., LLC*, 999 F.3d 954, 959 n.2 (4th Cir. 2021).

165.    At all times pertinent, Defendants were the recipient of federal financial assistance.  *See supra* ¶ 8.

166.    Plaintiff's impairments constitute a disability, as that term is defined by, and construed under, the Rehabilitation Act and other applicable law.

167.    At all times pertinent, Plaintiff was a qualified individual with a disability who could perform the essential functions of her job, with or without accommodations.

168.    Plaintiff repeatedly made Defendants aware of her need for reasonable accommodations, as detailed above.

169.    The sought forms of accommodation are viable and legally-protected under the applicable law and regulations.

170.    With reasonable accommodations, Plaintiff could perform all of the essential functions of her job.

171.    In response to Plaintiff's endeavor to secure reasonable accommodations, Defendants neither actively engaged in good faith in the interactive process nor made an individualized assessment of her needs as a disabled worker, which is unlawful.

172.    Defendants never, at any time, actually provided the effective reasonable accommodation of teleworking to Plaintiff that she had requested, despite their clear obligation to have done so, and they unreasonably and unnecessarily delayed the provision of other accommodations.[30]

---

[30] With respect to these delays, the very delay itself is independently discriminatory and actionable under the applicable law, and Plaintiff is seeking relief herein for same.  *See* EEOC, "Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act" (Oct. 17, 2002) ("An employer should respond expeditiously to a request for reasonable accommodation.  If the employer and the individual with a disability need to engage in an interactive process, this too should proceed as quickly as possible.  Similarly, the employer should act promptly to provide the reasonable accommodation.  Unnecessary delays can result in a violation of the ADA." (footnotes omitted)).

173.    Instead, after mistreating her for many months, Defendants wrongly suspended Plaintiff without pay and then terminated her, which obviously frustrated and interfered with such accommodations' very function and purpose.  In so doing, Defendants again clearly failed to ever fully accommodate Plaintiff, which is an unlawful employment practice under the Rehabilitation Act and other applicable law.

174.    As demonstrated by their acts and omissions, Defendants clearly felt contemptuous towards Plaintiff as well as their legal obligation to accommodate her.

175.    As a direct and proximate result of Defendants' violations of Plaintiff's rights, Plaintiff has suffered, and will continue to suffer, both economic and non-economic harm, including, but not limited to, loss of wages, loss of accrued but unused leave, loss of other benefits of employment including health insurance benefits, mental and emotional strain, stress, anguish, anxiety, depression, uncertainty, upset, inconvenience, insult, embarrassment, loss of enjoyment of life, loss of prestige, and loss of status, fluctuations in weight, sleeplessness, and nightmares.

WHEREFORE, Plaintiff prays that this Honorable Court or a jury determines that the practices by Defendants complained of herein were unlawful; that she be awarded judgment against Defendants, jointly and severally, for all available forms of monetary damages (including, but not limited to, back pay, back benefits, and compensatory damages) in an amount in excess of $75,000,[31] plus pre- and post-judgment interest, reasonable attorney's fees, expert witness fees, and costs; that she be awarded front pay and front benefits in lieu of reinstatement; and for all other and further relief that this Court or a jury deems appropriate.

---

[31] *See* Md. R. 2-305.

**Count X -- Violation of Maryland Common Law
(Wrongful Discharge)**

176.    Plaintiff realleges and reasserts each and every allegation set forth in Paragraphs 1 through 61 above, as if each were set forth herein verbatim.

177.    Following her suffering of a physical injury at her workplace on or about January 8, 2025, Plaintiff promptly notified Defendants of said workplace injury to begin the workers' compensation process and later, on or about March 11, 2025, formally filed a workers' compensation claim with the Maryland Workers' Compensation Commission.

178.    In so doing, Plaintiff exercised a legal duty, right, or privilege which involved a clear mandate of public policy, as made clear under well-settled Maryland common law.

179.    Plaintiff was obligated to periodically miss time from work on account of her workplace injury, to recover therefrom and receive treatment therefor.  Plaintiff was unjustly taken to task for doing so by Defendants.

180.    While she was still recovering from and seeking treatment for her workplace injury, Plaintiff was terminated without legitimate cause.  At the time of her termination, Plaintiff was still actively pursuing her workers' compensation claim.

181.    Particularly given their close temporal proximity, Defendants clearly terminated Plaintiff in response to her filing of a workers' compensation claim.  In doing so, Defendants violated Maryland state law.  *See* Md. Code Ann., Labor & Employ. § 9-1105(a) ("An employer may not discharge a covered employee from employment solely because the covered employee files a claim for compensation.").

182.    Defendants' termination of Plaintiff under these circumstances contravened a clear mandate of public policy, as express in § 9-1105 of the Labor & Employment Article of the Maryland Code.  *See Ewing v. Koppers Co.*, 312 Md. 45 (1988) ("Discharging an employee

42

solely because that employee filed a worker's compensation claim contravenes the clear mandate of Maryland public policy. The Legislature has made a strong statement to that effect in making such conduct a criminal offense, and our perception of the magnitude of the public interest in preserving the full benefits of the worker's compensation system to employees, and deterring employers from encroaching upon those rights, is equally strong."). *See also Ford v. Rigidply Rafters, Inc.*, 999 F. Supp. 647, 649-50 (D. Md. 1998).

183.    As a direct and proximate result of Defendants' violations of Plaintiff's rights, Plaintiff has suffered, and will continue to suffer, both economic and non-economic harm, including, but not limited to, loss of wages, loss of accrued but unused leave, loss of other benefits of employment including health insurance benefits, mental and emotional strain, stress, anguish, anxiety, depression, uncertainty, upset, inconvenience, insult, embarrassment, loss of enjoyment of life, loss of prestige, and loss of status, fluctuations in weight, sleeplessness, and nightmares.

WHEREFORE, Plaintiff prays that this Honorable Court or a jury determines that the practices by Defendants complained of herein were unlawful; that she be awarded judgment against Defendants, jointly and severally, for all available forms of monetary damages (including, but not limited to, back pay, back benefits, and compensatory damages) in an amount in excess of $75,000,[32] plus pre- and post-judgment interest, reasonable attorney's fees, expert witness fees, and costs; that she be awarded front pay and front benefits in lieu of reinstatement; and for all other and further relief that this Court or a jury deems appropriate.

---

[32] *See* Md. R. 2-305.

**Count XI -- Violation of Maryland Common Law**
**(Breaches of Contract)**

184.    Plaintiff realleges and reasserts each and every allegation set forth in Paragraphs 1 through 61 above, as if each were set forth herein verbatim.

185.    Plaintiff was employed by Defendants under a written, fully-executed employment contract in which Defendants agreed, among other things, to pay Plaintiff an annual salary and other benefits.

186.    Throughout her employment, Plaintiff performed services for Defendants in accordance with the terms of her contractual obligations.

187.    Under the terms of the aforementioned contract, which was signed by the Vice President and President of CCBC (both acting within the scope of their authority on behalf of Defendants), either Plaintiff or Defendants could terminate the contract for "any reason" with the provision of at least six months' advanced notice (during which time Plaintiff would continue to be paid) or, in the alternative, at any time "for cause."

188.    Even where the termination was allegedly for cause, Plaintiff's "pay or benefits" still had to be provided to her by Defendants.  More specifically, under the contract's express terms, whether it is terminated by either of the parties with or without cause, Plaintiff maintains that she should have remained entitled to payment for the six-month notice period.

189.    On or about December 2, 2025, Plaintiff provided Defendants with notice of her resignation, effective in excess of six months later on September 1, 2025.  Plaintiff felt compelled to provide this notice due to Defendants failure and refusal to properly accommodate her for her disabilities, as she explained to them, in writing, at the time.

190.    Plaintiff's employment was then involuntarily terminated by Defendants, in breach of the parties' contract, on March 19, 2025 -- well before the September 1, 2025 end date

44

Plaintiff had been compelled to provide and the September 19, 2025 end date that should have been provided by Defendants under the contract for their own termination decision -- unjustly and very prematurely rendering Plaintiff without a job.

191.    There was no legitimate "cause" for Plaintiff's firing, and in Defendants' termination letter authored by President Kurtinitis, who was the "final authority for termination" under the parties' contract, Defendants did not actually state that the termination was "for cause."

192.    In terminating Plaintiff in this fashion, Defendants did not act in an objectively reasonable manner or in good faith, did not base their decision on facts that they could reasonably believe to be true, did not reach a reasoned conclusion based upon then-existing circumstances, and/or had underlying motivations apart from the ground specified for firing Plaintiff.

193.    Following Plaintiff's firing, Defendants wrongly refused -- for over two full months -- to provide Plaintiff's paycheck to her for the work she had performed during the week of March 10-14, 2025.

194.    As such, Defendants materially breached the parties' contract by terminating Plaintiff, not providing payment to Plaintiff for the six-month notice period, failing and refusing to pay Plaintiff the monies and benefits due to her under said contract, and by unreasonably and unjustly delaying the provision of Plaintiff paycheck to her.  All of this was done by Defendants in the absence of either good faith or fair dealing.

195.    Defendants are, therefore, indebted to Plaintiff for any and all losses incurred by her on account of their breaches, even above and beyond just unpaid wages.  These debts remain due and owing.

WHEREFORE, Plaintiff prays that this Honorable Court or a jury determines that the practices by Defendants complained of herein were unlawful; that she be awarded judgment

45

against Defendants, jointly and severally, for all available forms of monetary damages (including, but not limited to, back pay, back benefits, compensatory damages, and consequential damages) in an amount in excess of $75,000,[33] plus pre- and post-judgment interest, reasonable attorney's fees, expert witness fees, and costs; that she be awarded front pay and front benefits in lieu of reinstatement; and for all other and further relief that this Court or a jury deems appropriate.

Respectfully submitted,


_/s/  Neil R. Lebowitz_____
Neil R. Lebowitz, No.: 9706250253
Lebowitz Law Firm
5850 Waterloo Road, Suite 140
Columbia, Maryland 21045
neil@lebowitzlegal.com
Tel. 410-730-9010
Fax 410-997-0238
Counsel for Plaintiff Davette Ceasar


**JURY DEMAND**

Plaintiff Davette Ceasar demands a trial by jury on all issues so triable.

Respectfully submitted,


_/s/  Neil R. Lebowitz_____
Neil R. Lebowitz, No.: 9706250253
Lebowitz Law Firm
5850 Waterloo Road, Suite 140
Columbia, Maryland 21045
neil@lebowitzlegal.com
Tel. 410-730-9010
Fax 410-997-0238
Counsel for Plaintiff Davette Ceasar

---

[33] *See* Md. R. 2-305.

46